## Milwaukee Loco. Mfg. Co., Aplnt., *v.* Point Marion C. Co.

Argued September 25, 1928.   Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*E. C. Higbee,* of *Sterling, Higbee & Matthews,* for appellant.—A master may loan his servant, with the latter's consent, to another under such circumstances as to create for the time a new relation of master and servant; the regular servant of one may thus for the time being become the special servant of another. The test is whether, in the particular service which he is engaged to perform, he continues subject to the direction and control of his master, or becomes subject to that of the party to whom he is lent: Puhlman v. Excelsior E. & S. Co., 259 Pa. 393; Tarr v. Coal & Coke Co., 265 Pa. 519; Crouse v. Lubin, 260 Pa. 329; Lecker v. Valentine, 286 Pa. 418; Standard Oil Co. v. Anderson, 212 U. S. 215.

The declarations of White were not part of the res gestæ: Leonard v. R. R., 259 Pa. 51; McMillen v. Strathmann, 264 Pa. 13; Riley v. Steel Co., 276 Pa. 82.

*H. S. Dumbauld,* for appellee.—The declarations of White were admissible: McGrath v. Sugar Co., 282 Pa. 265; Com. v. Gardner, 282 Pa. 458.

The court properly rejected the theory of plaintiff that White was simply a servant loaned by plaintiff to defendant to perform the work of defendant.

OPINION BY MR. JUSTICE SADLER, November 26, 1928:
The Milwaukee Locomotive Manufacturing Company, plaintiff, sold to the Point Marion Coal Company, the

defendant, an engine for the sum of $4,500, under a contract dated May 4, 1922, of which amount $1,125 was paid at the time of the execution of the agreement. The balance of the purchase price became due in three equal monthly installments, amounting in all to $3,375. The agreement of sale provided, inter alia: "The company, upon purchaser's request, will furnish a competent engineer to operate locomotive, and give full information and instructions regarding successful maintenance and operation of same to purchaser's employees, it being understood that purchaser, when making such additional request, will pay all hotel expenses, and an additional......per day for any and all days such engineer is retained by said purchaser after five days. $10.00." The remaining payments, on demand, were not made and an action was instituted by plaintiff to recover. The defendant set up a counterclaim for loss suffered as the result of an accident which occured on June 19, 1922, while the locomotive was being operated by one White, an engineer loaned to instruct the regular employees of the buyer. Admittedly, the electric motor was delivered as contracted for, and placed upon the premises of the coal company. The latter requested that a fit person be supplied to explain to its servants the proper manner of driving it, as stipulated, and this was done by the seller.

The mine of defendant was entered by a track which was constructed therein for some 1,800 feet. The loaded cars, theretofore moved by horse power, were pulled out to a point 118 feet from the entrance. Upon the throwing of a switch there located, and from which a double track was constructed, the cars were shifted to the rails on the left, and dropped by gravity from the summit of the hill, where a steep decline began. A drumhouse was installed for the purpose of controlling the moving cars, which were kept in place by means of sprangs until a rope or cable was attached to the rear of the draft, and, when these temporary obstructions were withdrawn, the

loaded cars proceeded down the slope under the direction of an operator in the drumhouse, the engine going to the right.

At the time White took charge of the locomotive for the purpose of instructing the employees, the mine foreman, Frowen, was in charge, and he gave the general instructions as to its operation, in so far as the place of stopping was concerned. With the placing of the sprags and the turning of the switch White had nothing whatever to do, according to the undisputed testimony. The only evidence appearing in the case tending to show that the injury was the result of a negligent act on his part is found in the testimony of Harris, who says that the former told him on the third trip that he would operate the motor in his own way, and that the locomotive engineer went too far before stopping, though a sufficient time elapsed for Harris to get off, turn the switch, and place some of the sprags. The mine cars had, however, attained such speed as to prevent their stoppage. There was also put in evidence a statement made to Brown, an officer of the defendant company, the afternoon of the accident, or the next day, by which it was claimed White admitted he was trying "to make the switch on the fly, and the trip got away from him." This was denied, but, even if true, does not show that the locomotive was operated under the direction and orders of the plaintiff company. Clearly, this proof was not receivable as part of the res gestæ. The declaration referred to was made later on the afternoon of the accident, or the next day. There was no such continuity of events as would make it other than a narrative of the occurrence by White, and was, therefore, inadmissible: Leonard v. B. & O. R. R. Co., 259 Pa. 51, 59; Com. v. Gardner, 282 Pa. 458; Riley v. Carnegie Steel Co., 276 Pa. 82; McMillen v. Strathmann, 264 Pa. 13.

Though the court, in its opinion refusing judgment n. o. v., insisted that the declaration to Brown might be considered as an admission of the plaintiff company

made by an authorized agent in the course of his employment, yet the facts do not justify this conclusion. It is true "admissions of agents or employees, while acting within the scope of their authority, may, under certain circumstances, be received as evidence against the superior": McGrath v. Penna. Sugar Co., 282 Pa. 265. To be received, however, "it must appear that the agent was specially authorized to make them; or his powers must have been such as to constitute him the general representative of the principal, having the management of the entire business; or the admissions must have formed part of the consideration of a contract; or, if they are noncontractual they must have been part of the res gestæ": Oil City Fuel Supply Co. v. Boundy, 122 Pa. 449, 460. Clearly, the statement could not be received as an admission of the agent of the locomotive company. He was not a manager of its business, or specially authorized to make declarations on their behalf, and, if he did so, was not acting within the scope of his employment, nor, as already noted, can this declaration be considered as part of the res gestæ. In view, however, of our determination that, under the undisputed facts, White is to be considered as an employee loaned to the defendant company for the purpose of giving instructions, and acting under the orders of the defendant's servants, thereby becoming, for the purposes of this case, a servant of it, consideration of this question, raised by an appropriate assignment of error, becomes unimportant.

The foreman, Frowen, directed Harris, an employee of the defendant company, who had been selected to receive instructions, to ride on the locomotive. The former was present when the first trip was made, but not at the time of the accident. He advised White when to stop, and that it was necessary for someone to throw the switch so that the locomotive would pass on the straight track to the right. Harris had the duty of getting off the engine when it had reached the designated point,

turning the switch and placing the sprags,—with the assistance of Worrell, who rode upon the train,—and holding the same in place until the cable from the drumhouse could be connected. White at no time had charge of throwing the switch, or obstructing the cars to delay the momentum of the draft, which it was necessary to do as the engine moved forward to the right track, the cars passing ultimately on one to the left.

On the day in question, the engineer White, after receiving orders from Frowen, made two trips with cars, on the first occasion unloaded, and on the second filled with coal, Harris, the employee of defendant, riding beside him, learning to handle the levers. On each occasion, when approaching the switch, the locomotive was stopped, Harris descended, turned the switch, and, with other employees, placed the sprags in front of the mine cars, the locomotive then moving forward. When the third trip was made, the motor was stopped before the switch was reached, while Harris got down for the purpose of holding the draft in place, but claims that the cars had proceeded so far and gained such momentum as to make it impossible to bring them to a standstill. As a result, they moved onward to the left, down the incline, and caused the injury complained of.

It is true that a principal is liable for the acts of his agent within the scope of his authority, but not beyond, and its responsibility does not extend to injuries resulting from the performance of unauthorized acts (Massillon Engine Co. v. Schirmer (Ia.), 93 N. W. 599), and it is the duty of the one with whom he deals to determine the scope of his authority: 2 C. J. 562. So the master is liable for the acts of nonfeasance or misfeasance of his servant, provided the latter is acting under the former's control, and within the line of the latter's duty: 39 C. J. 1280, 1282. In the present case the manufacturing company contracted solely to furnish, upon request, a competent person to instruct the employees of the owner of the mine. No further obliga-

tions were imposed or contemplated, and when the one supplied appeared, to operate the engine, the orders as to its movements were given by the mine foreman of defendant, Frowen. The desired instructions, as to the handling of the levers, were to be given to Harris, who rode in the cab, and it was his duty to dismount from the locomotive, turn the switch, and, with Worrell, sprag the cars. The sole function of White was to teach him how to control the motor, and his duties did not embrace the management of trains. There is no suggestion that the instructor furnished to the defendant company was in any way incompetent.

The facts presented are similar to those found in Hoar v. Lorraine Mfg. Co., 35 R. I. 474, 27 Atl. 305, where the seller of a machine had agreed to furnish men to unload it from the cars, and put it in position where required, and in so doing an accident occurred, and no liability on the part of the manufacturing company was held to exist. As was there said by the court, page 306: "The true situation was the loaning of a man by the boiler works to the defendant to assist it in erecting its boilers, and not, as the plaintiff claims, the loan by the defendant to the boiler works of Martin Hoar and other of its workmen to assist in an operation, which it was the duty of the boiler works to perform."

It is clear from the testimony of Frowen, the mine foreman, that White was not in control of the train. Harris had the duty of turning the switch, placing the sprags at the proper place, and seeing that the draft of cars moved to the left. The sole duty of White was to see that his engine was stopped before reaching the switch, and then to proceed on the main track which led to the right. Where the act is "done in obedience to the rules, instructions or orders given by the employer of any person, who has authority to direct the doing of the act," the person giving the orders is the agent of the employer, and it is the latter who is responsible for the loss which is suffered: Act June 10, 1907, P. L. 523;

Reese v. Jones & Laughlin Steel Co., 243 Pa. 336. The mere fact that White was operating the facility furnished and sold by the plaintiff company is not the controlling question (39 C. J. 1296), the matter to be determined is who was in control of the mine cars, and under whose orders they were switched. and attached to the cable for lowering.

It has frequently been held in Pennsylvania that one temporarily engaged in the service of another, though in the general employ of one who supplies him, becomes temporarily the servant of the hirer, or the one for whom the work is being done. Many recent cases establish this principle: Robson v. Martin, 291 Pa. 426; Tarr v. Hecla C. & C. Co., 265 Pa. 519; Lecker v. Valentine, 286 Pa. 418; Atherholt v. Stoddart Co., 286 Pa. 278; Persing v. Citizens Traction Co., 294 Pa. 230. "The doctrine of respondeat superior applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of the wrong, at the time, and in respect to the very transaction out of which the injury arose; and a servant employed and paid by one person may nevertheless be the servant of another in a particular transaction even when the general employer is interested in the work": Bojarski v. Howlett, 291 Pa. 485, 490; Byrne v. Hitner's Sons Co., 290 Pa. 225.

If it appears from all of the testimony in the case, as it here does, that the work performed was for the Point Marion Coal Company, and under the control of its employees, then no recovery can be had for the damages sustained, and binding instructions should have been given: Win v. Atlantic City R. R. Co., 248 Pa. 134; Herbstritt v. Lackawanna Lumber Co., 212 Pa. 495. It appeared in the latter case that the cars which broke loose were not in the possession or under the control of the defendant at the time of the accident, though previously placed by it at the point from which they started, and the latter was held not to be liable. It follows from

what has been said that the claim for damages, set up as a counterclaim to the action for the balance of the purchase price, cannot be sustained. Binding instructions for the plaintiff should have been granted.

The judgment is reversed and here entered for the plaintiff.